LOUIS J. MATTEGAT ET AL. *v.* JOHN
KLOPFENSTEIN ET AL.
(AC 17482)

O'Connell, C. J., and Spear and Dupont, Js.

Argued May 27—officially released August 25, 1998

*Michael S. McKenna*, for the appellants-appellees (plaintiffs).

*Eric N. Wellman*, for the appellee-appellant (defendant DUBL M. Enterprises, Inc.).

*Opinion*

DUPONT, J. The plaintiffs, Louis J. Mattegat and Melanie Mattegat, appeal from the judgment, rendered after a trial to the court, finding the defendant DUBL M. Enterprises, Inc., doing business as Housemaster of America (Housemaster),[1] negligent in the performance of a property inspection contract and awarding damages to the plaintiffs. On appeal, the plaintiffs claim that the trial court improperly (1) held that the recovery of damages for Housemaster's negligence was limited to those damages that were reasonably foreseeable, (2) employed the cost to repair the property, rather than the diminution in the property's fair market value, as the measure of damages and (3) concluded that the cost to repair the property was $17,000. Housemaster

---

[1] The plaintiffs recovered $11,000 from the named defendant, John Klopfenstein, and withdrew the action as to him. Klopfenstein was the listing real estate agent of the property that is the subject of this case.

cross appeals, claiming that the trial court improperly failed to restrict the plaintiffs' recovery of damages to the amount of the inspection fee.

The following facts are relevant. The plaintiffs executed a contract with Housemaster to perform an inspection of the premises at 154 South Main Street in Newtown prior to the plaintiffs' purchase of that property. On March 15, 1993, Richard Warren, an agent of Housemaster, performed the inspection, which included a probe for wood destroying insect infestation. The plaintiffs signed the contract, titled, "Inspection Order Agreement" (agreement), in which they opted for a "Limited-Time Inspection" with no warranty,[2] rather than an "Extended-Time Inspection" with a six month warranty. The agreement contained a clause that

---

[2] Paragraph one of the agreement provides: "INSPECTION OPTIONS. Due to the varying needs and interests of a Client for information regarding a prospective home and postinspection protection, the Company offers the Client a choice of inspection plans as noted below. Client shall select the preferred option by initialing the appropriate box. . . .

"A. LIMITED-TIME INSPECTION. In approximately 2-3 hours, for an average house, the Company will provide the Client with their professional opinion of the condition of the major elements of the house at the time of the inspection. *Due to the complexity of the various systems and elements of a house and the hundreds of value judgments made by the Inspector in this Limited-Time Inspection, the Company does not provide any guarantees regarding the inspector's judgments and findings.*

"The Company does, however, offer the Client a 12-month limited warranty, for a modest additional fee, on owner-occupied, one and two family houses. This inspection warranty covers specified repair or replacement costs not outlined or forecast in the inspection report, subject to the terms and conditions of the warranty. . . . The warranty may be purchased up to ten (10) days after title transfer.

"The cost of this Limited-Time Inspection is: $225 . . . .

"B. EXTENDED-TIME INSPECTION. In approximately 10-12 hours, for an average house, the Company will provide the Client with a more detailed, in-depth, evaluation of the condition of the major elements of the house at the time of the inspection. Since the inspector will not be limited by the time constraints associated with the Limited-Time Inspection and can enlist the help of system-element specialists when appropriate, *the Company will assume full responsibility for inspector errors or oversights—up to a maximum of $25,000 per inspection—regarding visible, accessible inspected*

is at the center of the parties' dispute. Housemaster claims that this clause limited its liability for any postinspection claims to the amount of the inspection fee.[3] The parties did not discuss this clause prior to the plaintiffs' signing of the contract. The agreement was signed on the day of and at the site of the inspection.

In his inspection report, Warren stated, under the headings "Infestation Status" and "Treatment or Damage Indications," that he found no visible evidence of past or current wood destroying insect infestation and no visible evidence or prior treatment for wood destroying insects. Under the heading "Limitations or Conducive Conditions," his report stated that there were conditions conducive to wood destroying insect infestation in the form of rot and decay. Warren also testified at trial that he did not observe any termite "mud tubes" or any destruction due to termite infestation. Warren indicated in his report that he was unable to inspect visually the entire premises because of snow and inaccessible crawl spaces. He further noted that certain areas of the premises showed signs of rot and that such conditions were conducive to infestation.

On the basis of Warren's inspection report, the plaintiffs purchased the property without further inspection for wood destroying insects. Immediately after closing

elements, for a period of six (6) months from the inspection date, subject to a $100 deductible per element/per occurrence.

"The cost of this Extended-Time Inspection is expected to be in the $1,500 range, depending on the size and condition of the house and special services or consultants utilized. The Company will arrange for a visit to the proposed property and prepare a firm inspection fee quote. The Client shall allow sufficient pre-purchase time for the quote preparation and inspection scheduling." (Emphasis in original.)

[3] Paragraph six of the agreement provides: "COMPANY LIABILITY. The Company's liability for any Client postinspection (Limited-Time) claims is limited to a maximum of the inspection fee paid unless an inspection warranty was purchased by the Client. This liability limit also applies to Extended-Time Inspections six (6) months from the inspection date."

the purchase, the plaintiffs began renovations on the property and soon discovered swarms of insects in the structure.

Mark Moore, a licensed exterminator, and Ronald Rennert, a consulting structural engineer, testified at trial as expert witnesses for the plaintiffs. Both Moore and Rennert were hired to view and examine the premises in June, 1993. They each testified that there was extensive *visible* evidence of wood destroying insect infestation in the building and that Warren had not exercised proper care in performing his inspection. Rennert immediately noticed a termite mud tube and testified that other mud tubes were readily observable without disruption of any of the building's timbers. Rennert, after viewing the premises, advised the plaintiffs that the damage was so extensive that the building was structurally unsound and should be razed. The plaintiffs notified Housemaster of the insect problem, and Housemaster offered to refund the plaintiffs' inspection fee, which the plaintiffs refused. The plaintiff later razed the building.

The trial court found that Housemaster was negligent because of its failure to use reasonable care in inspecting and evaluating the premises for visible damage and infestation. The court specifically concluded that Housemaster had failed to identify overt structural defects caused by infestation and visible signs of infestation. The court held that damages resulting from Housemaster's negligence were limited to those that were reasonably foreseeable and awarded the plaintiffs $775 for permits and renovation work, $2090 for the services of the structural engineer and $17,000 for the cost to repair the premises. The damage award amounted to $19,865, reduced by $11,000, which the plaintiffs had recovered previously from the defendant

real estate agent,[4] leaving $8965 to be paid by Housemaster.

I

We first address Housemaster's cross appeal, which contends that a clause in the parties' contract limits the plaintiffs' damages to $225, the amount of the inspection fee. We do not agree.

It is unclear whether Housemaster is claiming that paragraph six of the parties' contract is a liquidated damages clause or a disclaimer of liability clause.[5] We will address both possibilities. The clause states in part: "COMPANY LIABILITY. The Company's liability for any Client post-inspection (Limited-Time) claims is limited to a maximum of the inspection fee paid unless an inspection warranty was purchased by the Client." We first turn to the question of whether the clause constitutes an enforceable liquidated damages provision.

"[A] provision which allows liquidated damages for breach of contract is enforceable if certain conditions are satisfied. . . . The requisite three conditions are that: (1) the damage which was to be expected as a result of a breach of contract was uncertain in amount or difficult to prove; (2) there was an intent on the part of the parties to liquidate damages in advance; and (3) the amount stipulated was reasonable." (Internal quotation marks omitted.) *CMG Realty of Connecticut, Inc.* v. *Colonnade One Ltd. Partnership*, 36 Conn. App. 653, 667, 653 A.2d 207 (1995). Our review of the record and briefs indicates that these three requirements have not been established.

---

[4] See footnote 1.

[5] The trial court used the word "disclaimer" in describing the clause and stated in its memorandum of decision that the inspection described in paragraph 1 (A) of the contract was to visible and accessible elements of the house, and the "Company Liability" clause was an attempt to be exonerated from any liability.

Housemaster offered no explanation of why damages would be uncertain in amount or difficult to prove. In fact, the plaintiff was able to prove $19,865 in damages to the trial court's satisfaction. Housemaster also failed to demonstrate an intent on behalf of the parties to liquidate damages in advance. Although the record indicates that the plaintiff Louis J. Mattegat had an opportunity to read the contract before signing it, the parties never discussed the liability clause and no effort was made by Housemaster to explain the extent of its obligation to the plaintiffs. The sole fact even remotely related to the intent of the parties is that the plaintiffs signed the preprinted agreement. That fact, standing alone, is not sufficient to establish an intent to liquidate damages in advance. Finally, the requirement that the "stipulated" amount be reasonable has not been satisfied. The inspection fee of $225 falls so far short of the damages claimed by the plaintiffs and of the trial court's award of reasonably foreseeable damages that the unreasonableness of the "stipulated" amount is apparent. We conclude that the clause at issue is not an enforceable liquidated damages clause.

We now turn to the question of whether the clause is an enforceable disclaimer of liability for negligence. A disclaimer is a "refusal to recognize the existence of an obligation." Ballentine's Law Dictionary (3d Ed. 1969). "The law does not favor contract provisions which relieve a person from his own negligence. See generally 2 Restatement (Second), Contracts § 195, comment b; 17 Am. Jur. 2d, Contracts §§ 188, 189; 78 Am. Jur. 2d, Warehouses § 232; 8 Am. Jur. 2d, Bailments §§ 139–141." *Griffin* v. *Nationwide Moving & Storage Co.*, 187 Conn. 405, 413, 446 A.2d 799 (1982); see also *Malone* v. *Santora*, 135 Conn. 286, 293, 64 A.2d 51 (1949). The contract in this case was a preprinted form. Courts have shown a tendency to hold contracts of this type against public policy when entered into by professional

service providers in the course of dealing with the general public. See *Griffin* v. *Nationwide Moving & Storage Co.*, supra, 413. Such provisions have been upheld, however, under appropriate conditions, such as the assent of both parties. There was no assent here to limit the service provider's liability. See id., 413–14. Housemaster has failed to demonstrate that the contract contained an enforceable disclaimer provision.

## II

We now turn to the plaintiffs' three claims on appeal, all of which relate to the amount of damages awarded to the plaintiffs by the trial court.

## A

The plaintiffs' first claim is that the trial court improperly limited their recovery to those damages that were reasonably foreseeable.

This case seeks damages for the negligent performance of a contract, rather than for breach of contract. The trial court found as a fact that Housemaster was negligent in its performance of the termite inspection required by the parties' contract. This finding of negligence was amply supported by the evidence and cannot be disturbed.

The plaintiff is "entitled to recover all damages proximately caused by the [defendant's] negligent performance of the contract whether or not the results were reasonably to be anticipated." *Johnson* v. *Flammia*, 169 Conn. 491, 499, 363 A.2d 1048 (1975); see also *Neiditz* v. *Morton S. Fine & Associates, Inc.*, 199 Conn. 683, 689 n.3, 508 A.2d 438 (1986). The trial court's test for assessing damages in the present case was whether they were "reasonably foreseeable."[6] We must determine whether the court's test comports with that of

---

[6] The trial court specifically stated: "Damages resulting from a party's negligence . . . are limited to that which should be reasonably foreseeable."

*Johnson* and *Neiditz.* There is a paucity of cases in Connecticut that discuss the test for measuring damages for negligent performance of a contract.

In *Neiditz,* the defendant was a professional corporation engaged in the business of land surveying and civil engineering that negligently prepared a map that it knew would be used by the plaintiffs in seeking a zone change. The trial court awarded damages to the plaintiffs for the increased costs of developing their property, which arose because of the defendant's negligence in preparing the map, including the cost of complying with conditions imposed by the zoning board that would not otherwise have been necessary. The Supreme Court upheld that award of damages. It stated that "a party is liable only for those damages which are the proximate result of his negligence." *Neiditz* v. *Morton S. Fine & Associates, Inc.,* supra, 199 Conn. 689. The court distinguished the test of *Johnson* from that required in a breach of contract case, where damages are limited to those the defendant had reason to foresee as the probable result of the breach at the time the contract was executed. Id., 689 n.3, citing 3 Restatement (Second), Contracts § 351 (1981).

The *Johnson* and *Neiditz* cases indicate that the proximate cause test for negligence applies when assessing damages for negligent performance of a contract. The requirement of proximate cause is a less severe limitation of liability than the requirement of anticipation or foreseeability in breach of contract cases. A proximate cause is "[a]n actual cause that is a substantial factor in the resulting harm . . . ." (Internal quotation marks omitted.) *Abrahams* v. *Young & Rubicam, Inc.,* 240 Conn. 300, 306, 692 A.2d 709 (1997).

Although the trial court did not use the words "proximate cause," the test used by the court comports with the proximate cause test of *Johnson* and *Neiditz.* The

fundamental inquiry in all proximate cause questions is whether the harm that occurred was of the same general nature as the foreseeable risk created by the defendant's negligence. *Doe* v. *Manheimer*, 212 Conn. 748, 758, 563 A.2d 699 (1989). The trial court did not confine its test to what damages Housemaster, at the time of contracting, may have anticipated or foreseen as a probable result of a breach; rather, the court's test reflected the proximate cause query of what damages were reasonably foreseeable because they were within scope of the risk created by Housemaster's negligence. See id., 759. We therefore conclude that the trial court applied the proper causation standard for awarding damages.

B

The plaintiffs' second damages claim is that the trial court improperly concluded that the measure of damages for Housemaster's negligence was the cost to repair the property rather than the diminution in its fair market value. When proximate cause exists for damage to real estate, "[t]he basic measure of damages for injury to real property is the resultant diminution in its value." *Ferri* v. *Pyramid Construction Co.*, 186 Conn. 682, 689, 443 A.2d 478 (1982). Such diminution in value may be determined, however, by the cost of repairing the damage as long as that cost does not exceed the former value of the property and the repairs do not enhance the value of the property over what it was prior to the damage. Id.

The plaintiffs in the present case presented evidence at trial that the diminution in the value of the property amounted to $36,179. Evidence was also introduced at trial that the estimated cost to repair the damage to the property was between $15,000 and $17,000. The estimated cost of repairs here could not possibly exceed the former value of the property when the repair cost

is less than the diminution in value. There was no evidence at trial that the repairs would enhance the value of the property over what it was prior to the damage. A trial court in these circumstances has the discretion to select the repair measure of damages, limited only by the two provisos, which are not present here. Id. Accordingly, we conclude that the trial court properly applied the cost to repair the property as the measure of damages.

We further note that this measure of damages was proper as it relates to the proximate cause question discussed previously. Housemaster, as did the defendant in *Neiditz*, knew of the intended use of its report. Thus, the scope of the risk created by Housemaster's negligent performance of the inspection included the circumstances that the plaintiffs would buy the house based on a favorable report, and that the existence of extensive termite damage and infestation would require substantial repairs to the property. The estimated repair costs were proximately caused by Housemaster's negligence because they were within the scope of the risk created by that negligence and, as such, were reasonably foreseeable to Housemaster.

The razing of the building, however, was not proximately caused by Housemaster's negligence because it was not within the scope of the risks created by that negligence. Housemaster was never notified that the building was going to be razed and, thus, never had an opportunity to remedy the problem. In other words, the razing of the building did not follow in a natural continuum from the negligence involved in failing to detect the termite damage. See *Doe* v. *Manheimer*, supra, 212 Conn. 757–58; *Mourison* v. *Hansen*, 128 Conn. 62, 66, 20 A.2d 84 (1941). Furthermore, as the trial court noted, "There appears to have been a rush to raze the building without the determination of what could be done to save the structure." We conclude that

the estimated repair costs used by the trial court to determine damages, rather than the diminution in value, is the appropriate measure of damages.

## C

The plaintiffs' final claim is that the trial court's factual finding that the cost to repair the property amounted to $17,000 was clearly erroneous. The factual finding of a trial court is reversible only if it is clearly erroneous. Practice Book § 60-5, formerly § 4061; *Barszck* v. *Solnit*, 46 Conn. App. 112, 117, 698 A.2d 358 (1997). "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Shawmut Bank* v. *Brooks Development Corp.*, 46 Conn. App. 399, 405, 699 A.2d 283 (1997).

There is evidence in the record to support the trial court's finding that the cost to repair the property would have been $17,000. Through the plaintiffs' expert witness, Mark Moore, Housemaster entered into evidence an inspection report that included an estimate of the cost to repair the insect damage. The repair estimate was prepared by Barry Zanoni, a colleague of Moore who had inspected the property with him. According to the estimate, the damage that had been uncovered as of June 10, 1993, could be repaired at a cost of $15,000 to $17,000.

The trial court acted well within its discretion when it relied on the estimated cost to repair rather than the estimated diminution in value for purposes of determining damages.[7] On the basis of all of the evidence presented, we conclude that the trial court's finding as to

---

[7] Although there was evidence in the record regarding diminution in the property's value, as introduced through an appraisal prepared by Walter

the amount of the cost to repair was not clearly improper.

The judgment is affirmed.

In this opinion the other judges concurred.

Kloss, a real estate appraiser, the trial court could use the cost of repairs as the appropriate measure of damages.